Filed 7/21/15  P. v. Keith CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040440 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1109943) |
| v. | |
| COKILYA TABU KEITH, | |
| Defendant and Appellant. | |

A jury found appellant Cokilya Tabu Keith guilty of five counts of second degree robbery (Pen. Code, §§ 211-212.5, subd. (c), [1] counts 1-5), and as to all counts, found true the allegation that appellant was armed with a handgun within the meaning of section 12022, subdivision (a)(1).  In a bifurcated proceeding, the jury found true the allegation that appellant had four prior felony convictions:  assault with a firearm (§ 245, subd. (a)(2), assault with a deadly weapon or by means of force likely to cause great bodily injury with a criminal street gang enhancement (former § 245, subd. (a)(1), § 186.22, subd. (b)(1)); kidnapping (§ 207, subd. (a)), and threats to commit a crime resulting in death or great bodily injury (§ 422).

After the court denied appellant's *Romero* motion (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*)), on November 22, 2013, the trial court sentenced appellant to an indeterminate term of 25 years to life consecutive to a

---

[1] All further section references are to the Penal Code unless otherwise indicated.

determinate term of 11 years in state prison.  The court imposed various fines and fees and awarded appellant 1019 days' credit for time served.

Appellant filed a timely notice of appeal on November 25, 2013.

On appeal, appellant requests that this court conduct an independent review of the in camera hearing that was held on his *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)).  Further, appellant argues that the trial court abused its discretion and violated his state and federal constitutional right to due process and the effective assistance of counsel when the court denied his request for a continuance of the sentencing hearing.  Finally, appellant contends that the trial court erred in denying his motion to strike three of his four prior convictions.  For reasons that follow, we affirm the judgment.

*Facts and Proceedings Below*

Given the issues on appeal, briefly, we set forth the evidence adduced at trial.

On June 21, 2011, around 11:00 p.m., five employees of Seniore's Pizza in Santa Clara were closing up the pizzeria for the night.  Suddenly, two African-American men, Gilbert Foster and Sean Nevels, entered the pizzeria through the open back door.  At gunpoint, Foster and Nevels ordered the employees to get down on the ground; the employees complied.  The two men were wearing hooded sweatshirts and gloves; each was wearing a mask.

Foster moved Jesus Sanchez to the office and demanded that he open the safe.  Sanchez was unable to open the safe because he did not have the key; he told Foster he could not open it.  Foster struck Sanchez in the back of the head a couple of times with the gun and Sanchez fell to the ground.  Foster dragged Sanchez to the cash registers and made him open them.  Foster and Nevels took approximately $1,200 from the cash registers.

While the employees were still lying on the ground, Foster and Nevels bound their hands with duct tape and electrical wiring.  After being in the pizzeria for less than five

2

minutes, Foster and Nevels fled outside through the back. The employees called 911. Walid Eid, the manager of the pizzeria, was watching remotely from San Francisco on his cellular telephone as the employees were closing the pizzeria. Eid witnessed Foster and Nevels enter the pizzeria. Immediately, Eid called 911.

City of Santa Clara Police Officer Anthony Layton arrived at the scene within a few minutes of the dispatch call regarding a robbery in progress at the pizzeria. When Officer Layton pulled into the pizzeria's parking lot with his lights and siren off, he saw a white sedan backed into a parking stall near the back door of the pizzeria. Officer Layton got out of his patrol car and "deployed" his "AR-15 type assault weapon."[2] Officer Layton saw that the brake lights of the sedan flashed several times. Appellant was alone in the white sedan. A few seconds later, appellant attempted to leave the parking lot. At that point Officer Robert Martinez arrived. When appellant attempted to drive out of the parking lot, Officer Martinez pulled in and appellant veered toward Officer Layton. Officer Layton pointed his assault rifle at appellant and ordered appellant to stop. Appellant made a left turn and stopped in front of the pizzeria. Police officers assisted appellant, who is a paraplegic, in getting out of the Camry; they arrested him.

The police set up a perimeter in the surrounding neighborhood in an attempt to find two suspects who had fled from the pizzeria. Approximately, 30 minutes later, about a block away from Seniore's Pizza, Officers Enos and Bonenberger saw two African-American men walking down a driveway of an apartment building on Homestead Road. When the officers attempted to make contact with the men, one of them ran. Immediately, the officers arrested Foster. A canine officer located Nevels hiding in the laundry room of a house on Madison Street. Inside the wall of the laundry room, the police found a "do-rag," a head garment, containing $258 in cash.

---

[2] Officer Layton testified that his AR-15 assault weapon is a rifle.

Officers searched the backyards that were between the pizzeria's parking lot and Homestead Road where the police had first seen Foster and Nevels. Officers found two surgical masks, duct tape, a blue cloth bag containing cash, cash by itself (some with blood on it), a .38-caliber revolver, a .380-caliber semi-automatic pistol, a blue sweatshirt, a "wheatish-gold . . . color" sweatshirt, two pairs of pants, a green knit cap, gloves, a point of sales card from the pizzeria, and a shoeprint on a container.

Inside the white sedan, the police found a police scanner, a black backpack containing Foster's resume and parole papers, .380-caliber bullets inside a plastic bag, and a soft-zipper handgun pouch. On the navigation system inside the white sedan the second most recent address was 1468 Kelly Court in San Jose, which was Foster's address. The crime lab determined that the .380-caliber ammunition found in the white sedan matched the .380-caliber ammunition the police found in the magazine clip of the semi-automatic handgun that they recovered from one of the backyards in the neighborhood they searched.

Foster's DNA was found in a DNA mixture on the .380-caliber ammunition and magazine clip of the semi-automatic handgun, one of the surgical masks and possibly on two of the gloves, and a duct tape roll. Foster's and appellant's DNA was found on a water bottle seized from the Camry. The .380-caliber ammunition contained a mixture of DNA and there was evidence to conclude that appellant's DNA was part of that mixture. Nevels's DNA was found on the other surgical mask, a duct tape roll, and possibly on one of the gloves.

Forensic cell phone analyses conducted on a Blackberry phone found on the driver's floorboard of the Camry, a Motorola phone found on Foster's person, and a Huawei phone found in a shoe on the Camry's rear passenger floorboard revealed the following. The Blackberry's call log included an incoming call from a contact listed as "Black" and Foster's cell phone number at 10:36 p.m. on June 21, 2011; and Foster's cell phone number and the contact name "Black" were found in the Huawei phone's contact

4

list. Foster's phone had many incoming and outgoing calls to a contact listed as "Gotti" with the number (702) 503-0752, i.e., the phone number for the Blackberry phone. Foster's phone had contacts for "Sean" and "DueceBlack." The number connected to the "DueceBlack" contact was listed as (408) 469-5836.

When the police researched other possible connections between appellant and Foster, they learned that Officer Steven Russo of the Marina Police Department had stopped appellant in his vehicle on December 21, 2005. Foster was a passenger in the vehicle.

*Defense*

Foster testified for appellant at trial that on June 21, 2011, appellant gave him a ride from a job interview and he left his black backpack in appellant's car. About 9:30 p.m. that evening, he called appellant to buy some marijuana from him since he knew that appellant had a medical marijuana card. Foster said that he rented a black Acura or Toyota from a drug user and around 10:00 or 10:15 p.m., he and Nevels met appellant at a McDonald's in Santa Clara. By that time, he and Nevels had already planned to rob Seniore's Pizzeria. Foster said he had a "robbery kit," which included two loaded guns—a .38-caliber and a .380-caliber, extra bullets in a plastic bag, gloves, two hooded sweatshirts, sweatpants, an extra pair of shoes, and a police scanner with him when he got into appellant's car.

According to Foster, he and Nevels along with appellant were inside appellant's car smoking marijuana. Foster told appellant that he planned to go to his "girl's house and just to go look at the spot around the corner"; and after that he planned to go to his mom's house "immediately". Foster told appellant that he would call him when he got to his mom's house to let him know that he was "out of harm's way" and "safe." Before Foster and Nevels left appellant's car, each put on a "hoody" and gloves, changed their shoes, and armed themselves with guns. Foster took his blue bag but forgot his backpack, police scanner, and extra bullets; they were left in appellant's car. The plan

5

was to escape in the car that Foster had rented, which was parked nearby. Foster said that his last words to appellant were, "I'm about to go around the corner and check out this little pizza parlor[,]" "I'm going to my girl's house," and "I'm going in the house after that." After that, Foster and Nevels robbed the pizzeria. As they were leaving the pizzeria, Foster saw a flash of red light, thought it was the police, and attempted to escape with Nevels through the backyards in the neighborhood until they were apprehended by the police.

Appellant testified on his own behalf. He said that he and Foster were friends and Foster often helped him when he travelled to Las Vegas. On June 21, 2011, about 10:00 p.m., he drove from his house to a hair appointment in Santa Clara. On his way to his appointment, Foster called him to say that he had accidentally left his backpack in appellant's car; Foster asked to meet with him. Appellant said that he met Foster at a McDonald's and met Nevels for the first time. All three men smoked marijuana in appellant's car. Appellant thought Foster seemed agitated—"he just didn't seem normal . . . ." When appellant saw Foster and Nevels put on their "hoodies" and change their shoes and speak to one another in his car, he realized what was happening. Foster told appellant that he was looking to rob the pizzeria. Appellant watched Foster and Nevels walk toward Foster's car and then walk away. After sitting in his car for a few minutes, appellant decided to try to prevent Foster from robbing the pizzeria. When appellant went to look for Foster, he could not find him, so he drove to the pizzeria that Foster had described to him. When appellant arrived at the pizzeria, everything seemed normal and he parked in the parking lot. Appellant left his car running, finished smoking his marijuana, and checked the location of the hair appointment on his GPS system.

A few minutes later, a police officer drove into the parking lot and appellant tried to leave. The officer signaled for appellant to park in a spot; the officer was holding a rifle. Appellant pulled into the stall and parked his car. When a second officer arrived, they told appellant to get out of his car. Appellant informed them that he required

6

assistance because he is paralyzed.  The police helped him out of his car.  When they requested it, he gave them permission to search his car.  Appellant did not know what was in the backpacks or that there were bullets in the car.  After the police arrested appellant, they questioned him at the police station.  Appellant believed that the officers were trying to implicate him in the robbery and he failed to answer many of their questions honestly.

*Discussion*

*Pitchess*

Prior to trial, appellant filed a motion pursuant to *Pitchess*, *supra*, 11 Cal.3d 531. Specifically, appellant moved to have the personnel files of numerous Santa Clara Officers (Tyson Green, Stephen Sims, Tony Layton, David Schneider, Robert Martinez, Todd Cummins, Dave Tanquary, Stacy MacFarlane, and Kiet Nguyen) disclosed to the extent that they revealed complaints regarding dishonesty, illegal searches and seizures, fabrication of evidence and/or charges, inaccurate police reporting, or excessive use of force.

On March 14, 2013, counsel for the City of Santa Clara filed an opposition to appellant's *Pitchess* motion.  In so doing, counsel noted that defense counsel's declaration addressed solely excessive force and false reporting by the various officers; counsel requested that disclosure of information regarding complaints, if any, be limited to those two areas.

On March 20, 2013, the trial court held an in-camera hearing on the matter. The court found that there were no relevant documents to be disclosed to the defense. The court ordered the transcript sealed and ordered that the documents that the custodian of records brought to the court be maintained for "any period of further review by the appellate court . . . ."  The trial court conducted an in camera hearing and reviewed the officers' personnel files and files relating to Internal Affairs investigations for some of

7

the officers, after which the court determined and ordered that no disclosures would be made.

Appellant requests that this court conduct an independent review of the reporter's transcript of the in camera *Pitchess* hearing where the trial court reviewed the files for each officer. Appellant asks this court to determine whether any police personnel records were withheld incorrectly.

"When a trial court concludes a defendant's *Pitchess* motion shows good cause for discovery of relevant evidence contained in a law enforcement officer's personnel files, the custodian of the records is obligated to bring to the trial court all 'potentially relevant' documents to permit the trial court to examine them for itself. [Citation.] [An] officer's personnel record will commonly contain many documents that would, in the normal case, be irrelevant to a *Pitchess* motion, including those describing marital status and identifying family members, employment applications, letters of recommendation, promotion records, and health records. [Citation.] Documents clearly irrelevant to a defendant's *Pitchess* request need not be presented to the trial court for in camera review." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229 (*Mooc*).)

The California Supreme Court has explained that the custodian of records "should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*Mooc*, *supra*, 26 Cal.4th at p. 1229.)

In this case, after placing the custodian of records under oath, the custodian of records produced for the court a long-term personnel file and a short-term personnel file for each named officer,[3] plus five Internal Affairs investigations related to some of the officers. The custodian of records testified that any investigation related to misconduct or

_____

[3] The custodian of records was unable to produce a personnel record for Officer Sims because he no longer worked for the City of Santa Clara Police Department.

excessive force or acts of dishonesty would be located in the files he had brought with him. As to each officer, after reviewing all of the files for each named officer that the custodian of records produced, the court stated which files it had reviewed.[4]

The sealed record at issue here includes a full transcript of the in camera hearing, but not the actual personnel files that formed the basis of the trial court's ruling barring disclosure of the requested materials. It appears that the court reviewed everything in the short and long term personnel files for each officer as well as documents related to the internal affairs investigations for some officers. The sealed transcript that is before us, in which the court "state[d] for the record what documents it examined," is adequate for purposes of conducting a meaningful appellate review. (*Mooc*, *supra*, 26 Cal.4th at p. 1229.)

We have reviewed the record under seal and independently conclude that the trial court did not abuse its discretion in its ruling upon the *Pitchess* motion. (See *People v. Hughes* (2002) 27 Cal.4th 287, 330, [an abuse-of-discretion standard of review applies].)

*Denial of Appellant's Motion for a Continuance*

Appellant contends that the trial court abused its discretion and violated his right to due process by denying his motion for a continuance. We disagree.

At the sentencing hearing held on November 22, 2013, defense counsel stated that he had been in contact with appellant's hairdresser, Vernida Nichols. According to defense counsel, Ms. Nichols would have confirmed that appellant had an appointment with her to have his hair braided on the night he was arrested. Defense counsel stated that appellant's former counsel, Jacklyn Bentley, did not interview Ms. Nichols or attempt to secure her attendance at trial. Defense counsel noted that Ms. Nichols indicated to him that she would have been willing to come to trial to testify on appellant's

---

[4] It appears that the court reviewed everything in the short and long term personnel files for each officer as well as documents related to the internal affairs investigations for some officers.

9

behalf if she had been called as a witness. Accordingly, defense counsel asked the court to grant a continuance to give him additional time to reduce Ms. Nichols' statement to a declaration and to add an ineffective-assistance-of-counsel claim to appellant's motion for a new trial based upon his former defense counsel's failure to adequately investigate the case in this regard.

The prosecutor opposed defense counsel's request for a continuance. The prosecutor noted that the case had been tried six months earlier and the information was just being presented to the court. The prosecutor added that a motion for new trial was not "the proper vehicle to explore what she [Nichols] would have said, what she would say in court, what she'd say once I cross-examined her, what the trial attorney would say about the matter in a habeas corpus-like litigation prior to the judgment in the case." The prosecutor argued that even if the offer of proof proved to be true, it made no difference to the case that appellant missed a hair appointment on the night of the robbery.

Defense counsel disagreed with the prosecutor and urged the court under the authority of "the Fosselman case"[5] to determine the ineffective assistance of counsel claim. Counsel argued "there's nothing preventing this court from determining that claim."

The trial court denied the request for a continuance. The court stated, "I think the major disagreement is whether or not that's a colorable claim. I don't think it is. So I'm going to deny your request for a continuance. But the record has reflected your offer of proof, and both sides weighed in on that, and that will be my ruling."

Section 1050 governs continuances in criminal cases. The statute provides that in

_____

[5] According to defense counsel, "the Fosselman case, in fact, says that if a trial court can determine an ineffective assistance claim, it should." We assume that defense counsel was referring to *People v. Fosselman* (1983) 33 Cal.3d 572, in which the California Supreme Court held that criminal defendants may raise claims of ineffective assistance of counsel in a new trial motion. (*Id.* at pp. 582-583.)

10

order to continue any hearing in a criminal proceeding, "a written notice shall be filed and served on all parties to the proceeding *at least two court days before the hearing sought to be continued*, together with affidavits or declarations detailing specific facts showing that a continuance is necessary . . . ." (§ 1050, subd. (b), italics added.) "When a party makes a motion for a continuance without complying with the requirements of subdivision (b), the court shall hold a hearing on whether there is good cause for the failure to comply with those requirements. At the conclusion of the hearing, the court shall make a finding whether good cause has been shown . . . . If the moving party is unable to show good cause for the failure to give notice, the motion for continuance shall not be granted." (§ 1050, subd. (d).)

Defense counsel made an oral request for a continuance at the start of the sentencing hearing without providing the written advance notice to the prosecution or the trial court. Plainly, there was a failure to comply with the substantive and procedural requirements of section 1050, subdivision (b). However, it does appear that the trial court excused defense counsel's failure to comply with section 1050.

A continuance may be granted only for good cause, and trial courts have broad discretion to determine whether good cause exists. (§ 1050, subd. (e); *People v. Alexander* (2010) 49 Cal.4th 846, 934 (*Alexander*).) The denial of a motion for continuance is reviewed for abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) This standard applies to motions to continue sentencing hearings. (See e.g., *People v. Snow* (2003) 30 Cal.4th 43, 77 [continuance to prepare a new trial motion].) The party challenging the denial of a continuance bears the difficult burden of establishing that the court's discretion was abused. (*People v. Beames* (2007) 40 Cal.4th 907, 920 (*Beames*).)

Appellant argues the sole issue for the court was whether there was a sufficient reason offered to grant a continuance for a few days so counsel could investigate and research additional grounds for a motion for a new trial. He asserts that the trial court

11

denied a continuance on the ground that the additional grounds were not properly raised in a motion for a new trial. Appellant misreads the record.

In considering whether to grant a continuance motion, the trial court should consider whether the continuance would be useful. (*Owens v. Superior Court* (1980) 28 Cal.3d 238, 251.) Further, in determining whether a denial of a continuance amounts to a denial of due process, the appellate court looks to the circumstances of each case and the reasons presented for the request. (*People v. Howard* (1992) 1 Cal.4th 1132, 1171-1172.)

The granting or denial of a motion for continuance traditionally rests within the sound discretion of " ' "the trial judge who must consider not only the benefit which the moving party anticipates *but also the likelihood that such benefit will result*, the burden on . . . the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1125-1126.)

It is quite apparent to this court that the trial court denied the motion for a continuance on the ground that even if Ms. Nichols's testimony was as represented in defense counsel's offer of proof, appellant would not be successful in maintaining an ineffective assistance of counsel claim on the ground that there was no prejudice to appellant.[6]

Defense counsel indicated that had appellant's prior counsel interviewed Ms. Nichols and secured her trial testimony, she would have corroborated appellant's testimony that he had a hair appointment with her on the night of the robbery. Such evidence would have been of no help to appellant's defense. Plainly, appellant was at the crime scene and not at a hair appointment, as the police located him in the pizzeria's

---

[6] To prevail on a claim of ineffective assistance of counsel a defendant must establish that his counsel's representation fell below an objective standard of reasonableness *and* there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-687; *People v. Williams* (1997) 16 Cal.4th 153, 215.)

12

parking lot just moments after the robbery.  The only disputed issue at trial was appellant's intent.  Whether appellant failed to keep a hair appointment on the night of the robbery had little or no bearing on whether appellant's intent was to aid and abet in the robbery of the pizzeria or his intent was to stop Foster from robbing it, as he claimed.

Further, the trial court did not violate appellant's due process rights by denying the motion for a continuance.  Certainly, the exercise of judicial discretion in granting or denying a continuance may not impair a criminal defendant's constitutional right to due process.  (*People v. Maddox* (1967) 67 Cal.2d 647, 655.)  Here, the jury heard the evidence that appellant had a hair appointment on the night of the robbery from appellant and Foster.  The same evidence from Ms.Nichols might have corroborated that that was appellant's original intent, but it would have done nothing to help appellant's defense as it had no bearing on what appellant's intent was at the time of the robbery.

For similar reasons, appellant has failed to demonstrate any prejudice stemming from the court's denial of the motion for a continuance.  (*People v. Doolin* (2009) 45 Cal.4th 390, 450)  The evidence that appellant was pursuing would not have changed the jury's verdict.  Again, whether appellant had a hair appointment with Ms. Nichols on the night of the robbery was irrelevant.  Plainly, the trial evidence showed that appellant was not at the hair appointment.  Thus, the testimony had neither alibi value nor relevance to appellant's intent, since it did not show why appellant failed to keep his appointment.

Furthermore, the trial evidence showed that appellant was in his car in the parking lot of the pizzeria with a police scanner, ammunition for the guns used in the robbery, and other items belonging to Foster.  This evidence demonstrated that appellant acted with the intent to aid and abet Foster and Nevels in the robbery of the pizzeria.  Thus, the evidence that he had a scheduled hair appointment, even if believed by the jury, would have had no bearing on the jury's verdict.  Appellant fails to convince this court that if Ms. Nichols had testified the jury would have believed appellant's explanation of why he was in the parking lot of the pizzeria, to stop the robbery—rather than take into consideration the

physical evidence that was in appellant's vehicle that showed he was aiding and abetting the robbery.

Consequently, we conclude that the trial court did not abuse its discretion in denying appellant's request for a continuance.

*Denial of Appellant's Romero Motion*

On November 15, 2013, appellant filed a *Romero* motion in which he asked the trial court to strike three of his four prior strike convictions pursuant to section 1385. Appellant's strike offenses are (1) a 1997 conviction for assault with a firearm in which he was sentenced to 28 months in state prison; (2) a 1997 conviction for assault with a deadly weapon with a criminal street gang enhancement; (3) a 1997 conviction for kidnapping; and (4) a 1997 conviction for making criminal threats. In April 2002, appellant was released on parole and on April 1, 2005, appellant's parole period ended.

In the motion, appellant argued that his current offense, his prior strikes, and his character and prospects placed him outside of the Three Strikes law. Appellant pointed out that he had had a turbulent childhood, spent most of his life without his father, and was forced to move repeatedly, which impacted his ability to maintain lasting relationships; moreover, he lived in a crime-ridden neighborhood in San Jose, and was paralyzed when he was shot in the back during the commission of one of his crimes. Appellant also pointed out that he had completed his parole term without any violations or additional offenses. Following his release from prison, appellant said he reestablished contact with his children, became a role model to others who suffered from paralysis, and lived crime-free for the next decade.

The prosecutor opposed the motion. In so doing, the prosecutor argued that appellant could not be deemed to be outside the spirit of the Three Strikes law due to the nature and circumstances of his present offenses, his prior serious felony convictions, and the particulars of his background, character, and prospects.

14

The trial court denied the motion. The trial court commended both attorneys with respect to their briefs on the *Romero* motion. The court found that they were "both very thorough and thought provoking." However, the court found that appellant was "precisely the kind of person that was contemplated by the law with respect to these offenses and in considering all of his background."

Appellant contends that the trial court erred in denying his motion to strike three of his four prior strike convictions. We disagree.

In *Romero*, *supra*, 13 Cal.4th 497, our Supreme Court held that in cases brought under the Three Strikes law a trial court retains the discretion under section 1385 to dismiss a prior strike conviction " 'in furtherance of justice.' " (*Romero*, *supra*, at p. 530.) A "defendant has no right to make a motion, and the trial court has no obligation to make a ruling, under section 1385." (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) However, a defendant has "the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.' [Citation.]" (*Ibid*.) The court in *Romero* emphasized that "[a] court's discretion to strike prior felony conviction allegations in furtherance of justice is limited. Its exercise must proceed in strict compliance with section 1385(a), and is subject to review for abuse." (*Romero*, *supra*, at p. 530.)

Recently, in *People v. Vargas* (2014) 59 Cal.4th 635, our Supreme Court reiterated that "when facing a motion to dismiss a strike allegation, the trial court 'must consider whether, in light of *the nature and circumstances* of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects, *the defendant may be deemed outside the scheme's spirit*, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*Id*. at p. 641.) In *People v. Carmony*, *supra*, 33 Cal.4th 367 the court explained that "[b]ecause

15

the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Id*. at p. 378.)  Thus, the law creates "a strong presumption that any sentence that conforms to [the] sentencing norms is both rational and proper." (*Ibid*.)

As noted, the granting of a *Romero* motion is "subject to review for abuse of discretion.  This standard is deferential.  [Citations.]  But it is not empty.  Although variously phrased in various decisions [citation], it asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts.  [Citations.]" (*People v. Williams* (1998) 17 Cal.4th 148, 162; see also *People v. Garcia* (1999) 20 Cal.4th 490, 503.)  This abuse-of-discretion standard applies to appellate review of the *denial* of *Romero* motions.  (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 374-376.)  It is the defendant's burden as the party attacking the sentencing decision to show that it was arbitrary or irrational, and absent such showing, there is a presumption that the court acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.  (*Id*. at p. 377.)  Such a discretionary decision will not be reversed merely because reasonable people might disagree.  An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.  (*Ibid*.)

Appellant argues that his role in the offenses was minimal; and there was no evidence offered during trial to substantiate the prosecutor's claims that he was the mastermind behind the robbery.  He never entered the pizzeria and did not commit any acts of violence.  We are not persuaded.

The nature of, and circumstances surrounding, appellant's present felonies supported the court's decision not to strike any of his prior convictions. Appellant was convicted of five counts of robbery. The robberies were violent and serious felonies. (§§ 667.5, subd. (c)(9), 1192.7, subd. (c)(19)). Appellant, who was at the time a felon, was vicariously armed during these five robberies. His status as a felon with a firearm was a dangerous combination during the commission of the robberies. (Cal. Rules of Court, rule 4.421(a)(2);[7] see *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1037-1038 [due to the potential for death or great bodily injury from the improper use of firearms, public policy generally abhors even momentary possession of guns by convicted felons who, the Legislature has found, are more likely to misuse them].)

The robberies involved great violence or a threat of great bodily harm or acts disclosing a high degree of viciousness—at least one victim was struck in the back of the head a couple of times with a gun and then dragged to the cash registers and forced to open them. (Rule 4.421(a)(1).) Foster and Nevels committed a take-over style robbery using loaded weapons against five unarmed, helpless victims who were struck, dragged, and/or bound.

The victims were surprised by the armed intruders who came through an open back door as they were closing and cleaning the pizzeria late at night, making them particularly vulnerable. (Rule 4.421(a)(3).) The victims were rendered defenseless against the armed gunmen when the robbers bound them. (See § 1170.84 [a robbery in which a person engages in any tying, binding, or confining of the victim is a circumstance in aggravation].)

We reject appellant's argument that he played a minimal role in the robberies. At the time, appellant was 35 years old and had a serious criminal record with four prior strike convictions. Foster was 25 years old at the time of the crime; and it appears that

---

[7] All further rules references are to the California Rules of Court.

17

neither Foster nor Nevels had any strike priors. While appellant may have played a relatively passive role in executing the robberies, the evidence supports the conclusion that he played a major role in the planning of the robberies (despite his testimony to the contrary)—which included having two loaded handguns and using Foster and Nevels to carry out the robberies, choosing a closed pizzeria free of customers, taking advantage of the cover of darkness by committing the crime late at night, choosing a place with no foot traffic and a get-away plan through a dark parking lot, taking advantage of the employees opening the back door to empty the trash and backing into a stall with a view of the scene where he waited with his engine running, Foster and Nevels wore surgical masks, "hoodies," and gloves to avoid being identified and had clean clothes for getaway purposes, they retained additional ammunition in the getaway car, and had a police scanner in the getaway car in order to facilitate the getaway. Appellant's conduct showed a high level of planning or sophistication in committing the robbery. (Rule 4.421(a)(8).)

Finally, the nature and circumstances of appellant's prior felony convictions supported the court's decision not to strike any of the priors. Appellant's four prior strike convictions were either serious and/or violent felonies: (1) a 1997 conviction for assault with a firearm; (2) a 1997 conviction for assault with a deadly weapon with a criminal street gang enhancement; (3) a 1997 conviction for kidnapping; and (4) a 1997 conviction for making criminal threats. (See §§ 667.5, subd. (c)(14), 1192.7, subd. (c)(20), (31), (38).) According to the probation officer's report, the priors involved appellant accosting a vulnerable victim, a 14-year-old boy, at gunpoint on one occasion and attempting to rob a convenience store clerk, which turned into a shootout in which appellant was shot on another occasion. That appellant chose to return to a life of crime despite the injury he received in the shootout in no way distances him from the spirit of the law.

Appellant's background was far from favorable. Appellant was only 35 years old at the time of the robberies and he already had a lengthy criminal history, which started when he was just 19 years old. The record shows that appellant was a former gang

member and that he minimized his membership in that gang when speaking with the probation officer. Further, he lied to the probation officer, telling him that he was "completely innocent" after the jury had already convicted him, which shows a complete lack of remorse. (Rule 4.414(b)(7).) Although the record reveals that appellant had family who supported him and he led a conviction-free life for a period of time, plainly he continues to make selfish choices that have impacted his entire family, as well as the victims who were the subject of the robberies. Evidently, he has not learned from his prior imprisonments.

In light of the foregoing, it is evident that the trial court did not err in declining to exercise its discretion to strike any of appellant's prior strike convictions, as there was nothing to support the court's doing so "in furtherance of justice." Rather, the record reveals that appellant is precisely the type of offender who should not be deemed outside the spirit of the "Three Strikes" law. (See *People v. Williams*, *supra*, 17 Cal.4th at p. 163 [defendant has been taught, through the application of formal sanction, that his criminal conduct was unacceptable, but he has failed or refused to learn his lesson].)

## *Disposition*

The judgment is affirmed.

19

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.



_____

WALSH, J.[*]






*The People v. Keith*

H040440

_____

[*]Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution